**William KULIKOWSKI, Plaintiff,**

v.

**THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF BOULDER, Claudia Brown, in her individual capacity, Barbara Gigone, in her individual capacity, and Pam Morey, in her individual capacity, Defendants.**

No. CIV.A.00–K–1472.

United States District Court, D. Colorado.

Oct. 21, 2002.

John A. Culver, Seth J. Benezra, Benezra & Culver, LLC, Lakewood, CO, for plaintiff.

Andrew Ross MacDonald, County Attorney's Office, Boulder, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Oral argument in this intensely litigated reverse discrimination case was heard on August 28, 2002. William Kulikowski, PhD., a white male, sued his former employer Boulder County and several of his supervisors, asserting three claims for relief: (I) sex discrimination and retaliation in violation of Title VII(I); (II) denial of equal protection (Fourteenth Amendment deprivation) in violation of 42 U.S.C. § 1983; and (III) retaliation for exercising free speech rights (First Amendment deprivation) also in violation of § 1983. *See* Amended Compl. (filed 11/28/00). I grant the Motion in part and deny it in part.

## I. BACKGROUND.

Kulikowski began working for Boulder County Community Corrections as a half-time "interim caseworker" in January 1982 and remained there for approximately 18 years until February 2000, when his employment was terminated. Throughout his career with Community Corrections, Kulikowski was promoted numerous times, culminating in his selection as a case manager in the Adult Services section.[1]

---

1. "Case managers at Community Corrections schedule an appointment within five days of

Throughout the first ten years of his employment most of Kulikowski's reviews were favorable. He received one written reprimand in 1990, however, when former supervisor Jim Tanner admonished Kulikowski for his "lack of listening skills, not allowing discussion, and lack of clarity in communication." Defs.' Ex. 24.

In 1994, Kulikowski began questioning the management and make-up of Boulder County Safehouse, an organization that temporarily houses female victims of domestic violence. In September 1994, Kulikowski wrote Boulder County Acting Adult Services Administrator Debra Stein regarding the fact that Safehouse's board of directors was entirely female. This, Kulikowski asserted, may violate Boulder County funding regulations. Pl.'s Ex. L.

Stein forwarded the complaint to her supervisor, Hal Ness, who sent Kulikowski a written response on November 14, 1994. In his response, Ness stated that "[t]he Division [Boulder County Community Corrections] has no formal monitoring/auditing responsibility for Safehouse and we will not take a position [on the funding issue raised]." Defs.' Ex. 37. Dissatisfied with Ness's response, Kulikowski submitted a request to proceed to "step 5" of the employee complaint process, which provides for a review of a supervisor's or manager's decision. Barbara Gigone, the head of the Community Services Department, denied Kulikowski's request on grounds his complaint did not deal with his job responsibilities or with the County's Community Corrections Division in general. Defs.' Ex. 40.

After receiving Gigone's response, Kulikowski called Gigone and claims he was told if he "pursued [the Safehouse issue] he would be sorry." Pl.'s Ex. H. As a result of that interaction, Kulikowski filed a complaint with the Boulder County Board of County Commissioners regarding his treatment by Gigone. Pl.'s Ex. O. The complaint was not investigated.

Kulikowski continued to receive overall positive performance evaluations in 1995 and 1996. Defs.' Exs. 14, 30, and 31. In 1997, Pam Morey became Kulikowski's supervisor. Morey reported to Claudia Brown, the Adult Services Administrator. While Kulikowski received a positive evaluation from Morey in 1997, Morey's 1998 evaluation of Kulikowski was less sanguine. Morey noted Kulikowski was not properly updating placement summaries and stated Kulikowski inappropriately used team meetings as a venue for voicing dissatisfaction with divisional changes. Throughout the next few years, Kulikowski and Morey had numerous disagreements regarding Morey's evaluations of Kulikowski's performance. According to Kulikowski, Morey's supervisory requests were unclear and did not concur with policy requirements. Kulikowski also believed Morey was selectively applying the rules with respect to him and was not requiring other case managers to comply with those same rules.[2] Kulikowski sent Morey several emails asking her to provide policies and standards that were then clarified in writing and asking for meetings with Morey to clarify her expectations and concerns regarding his performance. Morey denied the majority of Kulikowski's requests for meetings, explaining Kulikowski had been given specific written and verbal instruc-

---

the offender's release, conduct an interview which focuses on social/legal history, current allegations, substance abuse and violence issues, or any other risk need factor. A supervision plan is developed and applied throughout the bond period." Defs.' Ex. 5 and 6.

2. For example, Kulikowski was told that he needed to take a mandatory lunch, even though this rule is not part of the handbook and Plaintiff alleges that other employees in a similar situation to him were not required to take a half hour lunch.

tions and denying her expectations were unclear. Defs.' Exs. 53 and 54.

On March 25, 1998, Kulikowski went to the EEOC to discuss his claim that he was being discriminated against based on his sex. I note that during this same time frame, Kulikowski received an overall positive performance review from Morey and a 3% merit raise. *See* 1997–98 Performance Appraisal (Defs.' Ex. 15). In the Appraisal Morey noted Kulikowski had done a "wonderful job of training and supervising volunteers/interns," but also commented on his neglect in informing Morey of schedule changes and on the lack of updates in his client placement summaries. *Id.*

The conflicts between Morey and Kulikowski intensified substantially in the next review period, with the result that Morey gave Kulikowski an overall "negative" performance evaluation in April 1999. Defs.' Ex. AA. For the first time since he had begun working for Community Corrections, Kulikowski did not receive a merit raise.[3] *Id.*

Problems escalated when Kulikowski refused to sign the 1999 performance evaluation on grounds he was not being reviewed in accordance with policy guidelines. In her affidavit, Kulikowski witness Lisa Mikesell[4] supports Kulikowski's assertion that he was an exemplary employee who was being singled out on the basis of his sex and retaliated against for raising questions about the future direction of Community Corrections and appropriate policies within the organization. Ex. X, ¶¶ 5–7. Mikesell states that, in her view, Claudia

Brown was biased towards men and referred to Kulikowski during that time period as a "pain in the ass" or "pain in the neck." *Id.* ¶ 8. Mikesell supports Kulikowski's assertion that he was being held to different standards in preparing client evaluations than other case managers, and believed Kulikowski was being made a "scapegoat." *Id.* ¶ 7. When Brown asked Kulikowski in February 1999 to train Mikesell in an area of client evaluations within Kulikowski's purview, Mikesell asserts it "became clear ... that Claudia Brown was beginning to phase Mr. Kulikowski out of Community Corrections." *Id.*

On May 27, 1999, Kulikowski filed a second complaint with Boulder County. Human Resources denied his request for an investigation. Pl.'s Ex. BB.

On June 4, 1999, Kulikowski received his first written reprimand in the County's disciplinary process and was placed on disciplinary probation. Defs.' Ex. 62. While the reprimand was from Morey, it was largely drafted by Claudia Brown and approved before Morey signed it by Brown's supervisor, Joe Thome. *See* Brown Depo., Defs.' Ex. 64, at 201–02. The three-page typewritten reprimand described in detail the history of Kulikowski's conduct leading up to it and concluded: "Your insubordination, failure to follow supervisory instructions, inadequate performance of any other inappropriate behavior [sic] will no longer be tolerated. You are expected to follow your supervisor's instructions and advice in the future." Defs.' Ex. 62.

---

**3.** According to the performance review, "As his supervisor, I feel Bill has been very hard to work with this past appraisal period. He has shown resistance in [sic] following orders or instructions that I have given him. An example of this resistance is his request that everything I ask him to do be in writing."

**4.** Defendants dispute the relevance of Mikesell's testimony to the issues on summary judgment, pointing out that Mikesell was a supervisor at the Longmont, not Boulder, Community Corrections office. Because supervisory staff were common to both offices and because Mikesell has first-hand knowledge of various actions and interactions at issue, I will consider her testimony.

On October 6, 1999, Kulikowski filed another employee complaint form alleging that his supervisor was discriminating against him by holding him to standards different from other case managers. Pl.'s Ex. JJ. In response, Joe Heard of Human Resources wrote Kulikowski a memo informing him that under the County complaint policy, his concerns must first be addressed by his supervisors. Pl.'s Ex. KK. At that time, Kulikowski also filed a charge of sex discrimination with the EEOC. His charge was investigated by Jane Vielehr, who concluded Kulikowski had not been the victim of gender-based discrimination or retaliation. Pl.'s Ex. YY. Kulikowski contends Vielehr's investigation was a "sham." Resp. Mot. Summ. J., Additional Undisputed Material Fact 102. On November 4, 1999, Kulikowski received his second written reprimand. Pl.'s Ex. MM.

On January 21, 2000, Community Corrections Division Manager Joe Thome issued the Department's performance evaluation of Kulikowski's second reprimand period. Defs.' Ex. 118. In it, Thome concluded Kulikowski had met certain expectations articulated for the period, but had failed to improve his performance in the areas of working relationships and certain job specific duties. *Id.* In a separate memo to Community Corrections Director Gigone the same day, Thome recommended Kulikowski be fired. Defs.' Ex. 123. "Mr. Kulikowski's work performance and his insubordination and antagonistic behavior," Thome wrote, "have escalated to the point where they totally hinder his ability to perform his job and warrant dismissal." *Id.*

Gigone conducted a pre-termination hearing with Kulikowski on January 28, 2000, during which, inter alia, she reviewed Kulikowski's narratives as well as those of other case managers.[5] By letter dated February 18, 2000, Gigone terminated Kulikowski's employment. Kulikowski did not appeal the decision to the Boulder County Review Board although he had the option to do so. He then amended his EEOC complaint to include his termination.

Kulikowski claims Defendants' actions constituted discrimination and retaliation on the basis of his sex in violation of Title VII, as well as retaliation based on his exercise of his free speech rights under the First Amendment and a violation of his rights under the Equal Protection Clause of the Fourteenth Amendment in violation of 42 U.S.C. § 1983.

## II. STANDARD OF REVIEW.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Simms v. Oklahoma,* 165 F.3d 1321, 1326 (10th Cir.1999) (quoting *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997)). When determining if summary judgment is appropriate, I must examine the factual record in the light most favorable to the nonmoving party. *Thomas v. IBM,* 48 F.3d 478, 484 (10th Cir.1995).

---

**5.** Plaintiff insists that Gigone only looked at his older narratives and not his more recent ones.

## III. MERITS.

### A. *Kulikowski's Title VII Claims.*

Title VII prohibits employers from discriminating against employees on the basis of sex, race or national origin. 42 U.S.C. § 2000e–2(a). In the absence of direct evidence of discriminatory intent, courts allow factfinders to infer it circumstantially from evidence presented in accordance with the burden-shifting analysis articulated in *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* test, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Establishment of a prima facie case creates a presumption of unlawful discrimination that requires a defendant to come forward with evidence of a nondiscriminatory explanation for its action. *Id.* at 254–55, 101 S.Ct. 1089. The explanation "must be legally sufficient to justify judgment for the defendant." *Carey v. U.S. Postal Service*, 812 F.2d 621, 624 (10th Cir.1987). If the defendant articulates a legitimate, nondiscriminatory reason for its action, then the burden of production moves back to the plaintiff. *Burdine*, 450 U.S. at 255–56, 101 S.Ct. 1089. In this third stage of the discrimination analysis, the plaintiff must show the protected status of race, gender, religion, or ethnicity was a determinative factor in the defendant's employment decision, or show the defendant's explanation for its action was merely a

pretext. *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1424–25 (10th Cir.1993). Failure to come forward with evidence rebutting the defendant's explanation may entitle the defendant to judgment. *See Burdine*, 450 U.S. at 255, 101 S.Ct. 1089. *Applied in Randle v. City of Aurora*, 69 F.3d 441, 451–53 (10th Cir. 1995).

### 1. *Retaliation.*

The analytical framework of *McDonnell Douglas* applies to retaliation claims under Title VII. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997).

In order to establish a prima facie case of discriminatory retaliation, Kulikowski must come forward with facts demonstrating that (1) he opposed activity in his workplace that he, in good faith, believed constituted unlawful sex discrimination; (2) thereafter he experienced an adverse employment action and (3) a causal connection existed between the protected activity and the adverse employment action. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320 (10th Cir.1999). A "causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir.1982).

Based on the record before me, and over Defendants' objection,[6] I find Kulikowski has made a prima facie case of Title VII

---

**6.** Defendants challenge Kulikowski's satisfaction of the third element of his prima facie case, causal connection, arguing his reprimands and termination were too remote in proximity to his allegedly protected activities to create an inference of retaliatory motive. Given the ongoing nature of the activity and exchanges between Kulikowski, Morey, Brown, and Thome on Kulikowski's complaints of gender inequity, I disagree. A

plaintiff's burden to demonstrate a prima facie case under the *McDonnell Douglas* analysis is "'not onerous.'" *Marquez v. Baker Process, Inc.*, 42 Fed. Appx. 272, 276 (10th Cir.2002)(quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). Because Kulikowski relies on more than just temporal proximity to establish the causation element of his prima facie case, I find Defendants' argument unpersuasive.

retaliation and that Defendants have asserted facially legitimate/nondiscriminatory reasons for their disciplinary actions against Kulikowski, to and including his termination. At this point, the burden under the *McDonnell Douglas* analysis reverts to Kulikowski to establish pretext, i.e., that "[Defendants'] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. .

As the Tenth Circuit explained in *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1396, n. 5 (10th Cir.1997), evidence bearing on the falsity of a defendant's proffered reason in a discrimination case does not have to challenge the proffered reason directly. At the third stage of the *McDonnell Douglas* analysis, a plaintiff can always produce direct evidence of discriminatory motive and in this way challenge the truth of the defendant's proffered reason. *Id.* (citing *EEOC v. Flasher, Co.*, 986 F.2d 1312, 1317 (10th Cir.1992)); *accord St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)(at the third stage of the *McDonnell Douglas* analysis, discrimination case looks like any other civil case where the plaintiff "at all times bears the ultimate burden of persuasion"). Thus, under ordinary summary judgment principles, Kulikowski · must produce evidence "from which a reasonable jury could believe that [Defendants'] proffered reason[s] [for reprimanding and/or terminating him] [are] false." *Id.*

Kulikowski first complained about the Safehouse issue in September of 1994 and his first complaint to the EEOC occurred in March 1998. His first negative performance review did not occur until fifteen months after the EEOC filing. Defendants contend it was this negative performance review that led Kulikowski to file his second EEOC complaint such that "[p]laintiff's protected activity was a response to the negative evaluation and rep-

rimand, and not the other way around." Defs.' Mot. Summ. J. at 31. Although the time period between Kulikowski's second EEOC complaint and his second written reprimand is more linear, Defendants insist it is insufficient under a summary judgment standard to support a finding of retaliatory motive. According to Defendants, "[t]he second reprimand was prepared pursuant to the review plan established in the first reprimand, which ... was issued before the complaint." Defs.' Mot. Summ. J. at 32.

■ Kulikowski denies he is relying solely on temporal proximity to establish retaliatory motive, and invokes *Marx v. Schnuck Markets*, 76 F.3d 324, 329 (10th Cir.1996), to argue temporal proximity should not, in any event, be "read too restrictively where the pattern of retaliatory conduct begins soon after the filing of the ... complaint and only culminates later in actual discharge." I agree, and find the evidence demonstrating Gigone, Morey and Brown's annoyance with Kulikowski's persistence on the Safehouse issue, the assertion that he should drop it "or else," and Mikesell's testimony that Kulikowski was being "phased out" and made a "scapegoat" as a result of his protests and opposition to what he, *inter alia*, perceived as sex discrimination constitute sufficient evidence of retaliatory motive separate from temporal proximity to survive summary judgment. While the credibility of these witnesses, and the relative irascibility of Kulikowski and his supervisors wholly separate from any discriminatory motive may be the subject of debate, it is one for the jury, not the court on summary judgment.

### 2. *Discrimination on the Basis of Sex.*

As a white male, Kulikowski faces a higher standard to establish a prima facie case and thereby secure the presumption

of discrimination under *McDonnell Douglas.* *Notari v. Denver Water Dep't,* 971 F.2d 585, 590 (10th Cir.1992)(articulating standard for prima facie case of reverse discrimination). Specifically, he "must in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who [sic] discriminates against the majority." 971 F.2d at 585.

■ Kulikowski relies on the testimony of Lisa Mikesell and two of his male coworkers to establish that Boulder County is one of those unusual employers that discriminates against men. William Wood, a nine-year employee of Community Corrections, stated in his deposition that women in the department are given preferential treatment in the assignment of parking spaces, investigation of harassment claims[7], and participation in hiring committees.[8] He thinks such examples are indicative of a generally negative attitude towards men.[9] George Forgue, currently employed as a case manager with Community Corrections, testified he has heard County employees complain that Brown treats men differently from women. According to Forgue, "I remember discussing at one point with somebody that if we

wanted an idea to be considered, the thing to do was to suggest it to a female staff member to present, and then it would be considered." Forgue Depo., Pl.'s Ex. I, at 52. Mikesell claims to have heard Brown say she does not like men, Mikesell Depo., Pl.'s Ex. J, at 18, and testified Forgue was more qualified than she for her position (he had also applied) and that "[i]t was awkward because he had to train me how to do what I was supposed to supervise him to do." *Id.* at 27.

In addition to evidence tending to show Community Corrections supervisors discriminated against men, Kulikowski also presents evidence to suggest female employees were treated better than similarly situated male employees. Similarly situated employees are those who work under the same supervisor and are subject to the same rules and disciplinary standards as plaintiff. A comparable work history to plaintiff may also be an indicia of being similarly situated. *See generally Aramburu v. The Boeing Company,* 112 F.3d 1398, 1404 (10th Cir.1997).

Kulikowski first cites Susan Romig. Although Romig had numerous disagreements with Brown and Morey, her employment was not terminated and she received

---

7. Wood, who is homosexual, testified that he once found a cartoon in his mailbox depicting two grim reapers dragging Matthew Shepard's body. (Shepard's murder was widely publicized at the time as a hate crime.) Someone had written Wood's name across the dead body. Wood reported the incident, and testified Brown and Morey responded by saying something along the lines of "Well, let's keep an eye on it." No further investigation was conducted and Wood stated he believed it would have been different had a female employee experienced a similar occurrence. Deposition of William Wood, pp. 75–78, Pl.'s Ex. D.

8. In his previous job with the Justice Center, Wood was frequently asked to participate in hiring committees, yet when he commenced

employment with Community Corrections Wood was no longer included in the hiring process. He voiced this concern to Pam Morey, who he claimed then asked him to serve on a committee on a day she and Brown knew he would not be able to attend. Wood Depo. at 69.

9. "I guess first and foremost would be over the last two or three years, it's kind of been talked about as the feminization of Community Corrections based on the number of males that [sic] have left and the number of females that [sic] have been hired to replace [them]. That would be a very general statement and I don't have any statistics to see who all had left and come on, but that was the feeling." Wood Depo. at 66.

a raise.[10] Defendants counter that Romig was a clerk, not a case manager, and was therefore not "similarly situated." Kulikowski also refers to Maribel Rodriguez, a case manager also supervised by Morey. Kulikowski contends Rodriguez embezzled money from her clients and was given the option to resign rather than be fired. Defendants respond that Kulikowski also had the option of resigning, and could have done so at any time. Finally, Kulikowski contends Cynthia Huerta, a case manager who also reported to Morey, failed to include rationales for supervision in her case narratives but was not disciplined. Defendants distinguish Huerta on grounds that she, unlike Kulikowski, did not have "continuing and seriously deficient narratives nor did she refuse to follow her supervisor's instructions, nor did she, engage in any other acts of insubordination." Defs.' Reply in Support of Mot. Summ. J., p. 5.

■ The witness testimony offered by Kulikowski as support for his claim that men were discriminated against at Boulder County Community Corrections is, when viewed in the light most favorable to Kulikowski, sufficient to establish a prima facie case under *Notari*. Proceeding to the question of pretext, my earlier determination that Kulikowski has come forward with sufficient evidence to survive summary judgment on the issue of pretext applies equally here. Defendants' assertion that Kulikowski was disciplined and fired for legitimate, nondiscriminatory reasons is for a jury to decide.

### B. *Kulikowski's § 1983 Claims.*

In addition to his claims under Title VII, Kulikowski claims that Boulder County, as well as individual Defendants Brown, Gigone and Morey, violated his equal protection and free speech rights under the First Amendment in violation of 42 U.S.C. § 1983. Section 1983 imposes civil liability upon

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws ....

42 U.S.C. § 1983.

### 1. *Municipal Liability.*

Local governmental entities such as cities and counties have been defined as "persons" against whom liability can be asserted under § 1983, but may be called to task only for their own policies or firmly entrenched customs that violate the constitution, not for the unconstitutional acts of their individual employees. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)(§ 1983 does not impose vicarious, or "respondeat superior," liability on local governmental entities for the acts of their employees). The Supreme Court has articulated three ways in which a plaintiff may establish the existence of an unconstitutional custom or policy for purposes of municipal liability under *Mo-*

---

**10.** These disagreements are documented over email in Pl.'s Ex.WW. The emails are incredibly bitter on Romig's side. For example, in one email from Romig to Morey, Romig stated, "Please, I was at the meeting when our assistant director told Bill Kulikowski his opinion was BULLSHIT and called him a JACKASS. I hear Betty say GODDAMNIT all the time, and I have to hear about crapola? No response is necessary, I can guess your thoughts and I am sure you know mine." In another email, Romig wrote to Morey, "Your obtuse reply does not fool me. My opinion of you is shared by all I know and I have nothing more to say."

*nell:* (1) there is an express policy that causes a constitutional deprivation; (2) there is an allegation that the constitutional injury was caused by a person with final policymaking authority; or (3) there is a widespread, though not express, practice of deprivation that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 122–23, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)(quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). It is the latter that forms the basis for Kulikowski's § 1983 claim against Boulder County here.

■ Kulikowski claims the Boulder County Board of County Commissioners has a "custom" under *Monell* of retaliating against individuals who exercise their First Amendment rights. To establish a case based on custom, Kulikowski must prove:
(1) The existence of a continuing, persistent and widespread practice of unconstitutional misconduct by the [County]'s employees;
(2) Deliberate indifference to or tacit approval of such misconduct by the [County]'s policymaking officials (board) after notice to the officials of that particular misconduct; and
(3) That [he] was injured by virtue of the unconstitutional acts pursuant to the board's custom and that the custom was the moving force behind the unconstitutional acts.
*Gates v. Unified School District,* 996 F.2d 1035, 1041 (10th Cir.1993). Kulikowski's evidence is insufficient to create a triable issue on any of these factors.

In support of his § 1983 claim against the County for abridgement of his First Amendment rights, Kulikowski relies again on the deposition of former Boulder County employee Lisa Mikesell, who claims she was retaliated against for complaining about Brown's discriminatory behavior. Pl.'s Ex. J. According to Mikesell, immediately after she complained to Joe Thome in 1999 about Claudia Brown's treatment of Kulikowski and the general lack of morale in the department, she observed a change in Brown's treatment towards her. Mikesell alleges that Brown threw a pen at her and slammed a door in her face. As Brown's mistreatment of Mikesell continued, Mikesell testified Brown began to criticize her work by saying she was not fast enough. Brown refused to give Mikesell a raise and withheld her Christmas bonus. *See* Mikesell Depo., pp. 29–33, Pl.'s Ex. J.

■ Although Kulikowski has only this one witness, he relies on *Sekerak v. City & County of Denver,* 1 F.Supp.2d 1191, 1198–99 (D.Colo.1998), to argue evidence that another employee had been subjected to similar retaliation as plaintiff "may" give rise to § 1983 liability and is sufficient to withstand a motion for summary judgment. The reliance is misplaced, in that in *Sekerak,* the City's liability turned on the question of whether the individual who allegedly retaliated against plaintiff was a "final policymaker" under *Monell*'s second theory of municipal liability, not on the existence of any widespread "custom." *See id.* at 1198. There is no assertion by Kulikowski here that Brown was a final policymaker for the County, and the *Sekerak* case is inapplicable. Moreover, Mikesell conceded Brown's treatment of her was not the primary reason for her resignation. Mikesell Dep, Pl.'s Ex. J at 34 ("Primarily it was a personal thing. I wasn't using my clinical skills. There was no place for them. And I've been doing clinical work for many years, so that was a 'goodness of fit problem.'" (internal quotation marks mine)). Thus, while there are indications of hostility towards Mikesell for voicing her opinions, that hostility is insuf-

ficient to support an inference of "widespread" or "customary" retaliation.

■ Similarly, Kulikowski's assertion—and anecdotal evidence suggesting—that the County had a "custom" of failing to investigate allegations of discrimination or retaliation in the workplace does not, perforce, establish that it had a "custom" of unlawful retaliation and neither of the cases on which by Kulikowski relies to support this contention in fact do so. The evidence of a department-wide custom of retaliation against a police officer whistleblower in *Blair*, for example, extended far beyond a failure to investigate individual incidents of alleged retaliation, including, among other things, knowledge and tacit approval of

> insults written on [officer's] locker; spittle spat on his locker; the wiring shut of his locker; the theft of his equipment; the cutting off of his radio communication; the trashing of his uniforms; the dumping of drinks in his unit car; the backturning of fellow officers; the tolerated denial of backup; the insults offered by officers to his mother, wife, and children; the blocking of his mother's car; his removal as head of STOP and transfer to a position subordinate to an officer who didn't want him; the telephoning of a threat of bodily injury to him and of death to his family; and the failure to provide a guard for him after the threat.

*Blair v. City of Pomona*, 223 F.3d 1074, 1079 (9th Cir.2000). In *Sharp v. City of Houston*, 164 F.3d 923, 935 (5th Cir.1999), also a police officer whistleblower case involving direct snubs and delayed reaction times that threatened plaintiff officer's safety, plaintiff came forward with nine witnesses who testified to a "code of silence" fostered and encouraged by the defendant city to argue judgment as a matter of law in her favor was warranted. The testimony of William Wood that his complaint of harrassment was "brushed off" or of Mikesell that no one investigated her complaints about Kulikowski's mistreatment do not approach the level of tacit approval and encouragement of retaliation described in *Blair* or *Sharp*, and does not give rise to an inference of a policy or custom of unlawful retaliation by Boulder County.

Kulikowski's evidence in support of his § 1983 claim against the County fails under a summary judgment standard and Defendants' Motion for Summary Judgment is granted as to this claim.[11]

2. *Plaintiff's § 1983 Claim Against Individual Defendants: Gigone, Brown and Morey*

■ Qualified immunity shields government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983 unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "To reach the ques-

---

**11.** Although Kulikowski also purports to assert an equal protection claim against the County under § 1983, he largely fails to address this claim in his briefing. At most, Kulikowski offers the testimony of male co-worker William Wood as evidence of a policy or "custom" of disparate treatment against men. The comparison itself is a stretch, and Wood's testimony certainly falls short of establishing the type of "widespread" or "pervasive" disparate treatment necessary for any assertion that the County has a "custom" or "policy" of unconstitutionally disparate treatment between the sexes. Woods's uninvestigated complaint was about a particularly virulent incident of homophobic harassment, not the sort of gender-based discrimination on which Kulikowski bases his equal protection claim. Kulikowski's custom or policy-based § 1983 claim against the County for equal protection violations is dismissed.

tion of whether a defendant official is entitled to qualified immunity, a court must first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right at all." *Romero v. Fay,* 45 F.3d 1472, 1475 (10th Cir.1995)(internal quotation omitted)(applying *Siegert v. Gilley,* 500 U.S. 226, 231–33, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). This requires the district court to "first determine whether plaintiff's allegations, if true, state a claim for a violation of a constitutional right that was clearly established when defendant acted." *Id.* (quotation, again, omitted). If plaintiff successfully carries this two-part test, the burden shifts to the defendant as an ordinary movant for summary judgment of showing there are no disputes of material fact about whether his conduct was objectively reasonable in light of clearly established law and the information known to him at the time. *Mick,* 76 F.3d at 1134 (citing *Albright,* 51 F.3d at 1535). *See Romero,* 45 F.3d at 1475.

i. Gigone.

Kulikowski's First Amendment retaliation and equal protection claims against Gigone are premised on allegations that Gigone (1) told him to drop the Safehouse issue or he would be "sorry"; (2) was "involved" in his first and second reprimands; (3) told Thome about Kulikowski's propensity for complaining about Safehouse and other issues and encouraged him to terminate Kulikowski's employment; and (4) failed to conduct a valid investigation regarding his termination. None of these is sufficient to support a claim for a constitutional violation against Gigone, individually.

■ Given Gigone's role in the organization and level of decisionmaking authority, it is unclear, specifically, what conduct it is that Kulikowski claims constitutes "retaliation" based on his exercise of free speech rights under the First Amendment. Gigone did not terminate Kulikowski. As for her back room encouragement of Thome to terminate Kulikowski or her "involvement" in the written reprimands that preceded it, Kulikowski has come forward with no authority or argument that persuades me these constitute an abridgement of his First Amendment rights of free speech. The causal chain between Kulikowski's speech, Gigone's reaction and Kulikowski's termination is simply insufficient to support a First Amendment retaliation claim against Gigone under § 1983.[12]

■ As far as Kulikowski's claim that Gigone violated his equal protection rights by conducting a "sham" investigation, Kulikowski must prove that (1) Gigone, as his supervisor, had notice of a pattern of violation concerning male employees' constitutional rights; (2) displayed deliberate indifference or tacitly authorized such conduct; (3) failed to take steps to alleviate the conduct; and (4) this failure lead to his injury. *Gates,* 996 F.2d at 1041. This claim fails with Kulikowski's custom claim generally: There can be no supervisor liability for unconstitutional patterns or practices where plaintiff cannot establish the existence of such a pattern or practice in the first instance. Gigone's Motion for Summary Judgment on Kulikowski's § 1983 claims against her individually is granted.

ii. Brown and Morey

■ Kulikowski alleges Brown verbally insulted him and that both Brown and Morey sought his termination and mischaracterized his performance in evaluations in order to effect it. These

---

**12.** While Kulikowski's claims about the Safehouse issue and Gigone's telling him to drop it or be "sorry" are not sufficient to support a

First Amendment retaliation claim under § 1983, the evidence thereof is admissible in support of his Title VII claims.

allegations simply do not give rise to constitutional claims for First Amendment retaliation or violations of equal protection. The decision to terminate Kulikowski was made by Thome and it was Thome who was responsible for supervising Plaintiff during the second written reprimand period. The assertion now that Morey, Brown and Gigone may have "conspired" with each other and with him to oust Kulikowski does not cure this defect.[13] The evidence in the record supports neither a claim against Morey or Brown for retaliation in violation of Kulikowski's free speech rights or for equal protection violations independent of those asserted against the County. Kulikowski's § 1983 claims against Brown and Morey individually must be dismissed.

## IV. CONCLUSION.

Based on the foregoing, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's claims under 42 U.S.C. § 1983 against all Defendants. Judgment shall enter for Defendants and against Plaintiff on those claims. Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's claims for retaliation and reverse discrimination under Title VII. Those claims will proceed to trial A pretrial conference on those claims only will be set by separate Minute Order.

---

**13.** I note that Thome is not named as a defendant to this action and there is therefore no principal with whom Gigone, Brown and Morey could have conspired in any event.